**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JAMES CAMPBELL**,**

Plaintiff,

-against-

CITY OF NEW YORK; DETECTIVE JAMES OUELLETTE,
SHIELD NO. 6852, DETECTIVE GARY SCOLLARD,
SHIELD NO. 7804, FIELD INTELLIGENCE OFFICER
SINAN CAGIRICI SHIELD NO. 18239, POLICE OFFICER
JOHN PAUL VINCULADO SHIELD NO. 00936,
DETECTIVE KAI ESTWICK SHIELD NO. 02592,
SERGEANT ROBIN CASTILLO SHIELD NO. 00956,
SERGEANT SCOTT ANDERS, JOHN and JANE DOE 1
through 10, individually (the names John and Jane Doe being
fictitious, as the true names are presently unknown),

Defendants.

**COMPLAINT**

**Index No. 19-CV-3661**

---

Plaintiff JAMES CAMPBELL, by his attorneys, ROB RICKNER of ROB RICKNER

PLLC and ABRAHAM RUBERT-SCHEWEL of LORD & SCHEWEL PLLC, alleges the

following:

<b>PRELIMINARY STATEMENT</b>

1. Plaintiff James Campbell ("Campbell" or "Plaintiff") served 46 days in jail after being

   wrongfully arrested and charged with a string of larcenies that he did not commit.

2. Campbell brings this action for compensatory damages, punitive damages, and attorney's

   fees pursuant to the statutory and common law of the State of New York, common law

   negligence; and pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his

   rights under the Constitution of the United States of America.

1

## JURISDICTION

3.   This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) because Campbell's claims arise under law of the United States and seek redress of the deprivation under color of state law of rights guaranteed by the United States Constitution.

4.   Plaintiff further invokes this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over any and all New York state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

5.   Plaintiff complied with the requirements of New York General Municipal Law Section 50-1 by serving a notice of claim on the City of New York dated March 1, 2018.

6.   A supplemental notice of claim was filed on behalf of plaintiff on May 1, 2018.  More than thirty days have elapsed since the notice of claim, and no offer of settlement has been made.

7.   Plaintiff stipulated to adjournment of his 50-h hearing due to his incarceration.

## VENUE

8.   Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), and 28 U.S.C. § 1402(b), where Defendants reside and maintain their relevant places of business, and where the actions complained of herein occurred.

## JURY DEMAND

2

9.   Plaintiff Campbell respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## THE PARTIES

10. Plaintiff Campbell is a resident of the of the State of New York.

11. Defendant City of New York is a municipal corporation organized under the laws of the State of New York.  It operates the New York City Police Department ("NYPD"), a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers, including the individually named defendants herein.

12. Defendant Detective James Ouellette ("Ouellette"), Shield No. 6852, was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

13. Defendant Detective Gary Scollard ("Scollard"), Shield No. 7804, was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

14. Defendant Sergeant Scott Anders ("Anders") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment

pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

15. Defendant Field Intelligence Officer (FIO) Sinan Cagirici ("Cagirici") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

16. Defendant Detective Estwick ("Estwick") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

17. Defendant Sergeant Robin Castillo ("Castillo") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

18. Defendant Detective John Paul Vinculado ("Vinculado") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

4

19. Defendant Officer Jose Morales ("Morales") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

20. Defendant Officer Tamarah Pinckney ("Pinckney") was at all times relevant to this Complaint a duly appointed and acting employee of the City of New York and the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the NYPD.  He is sued in his individual capacity.

## STATEMENT OF FACTS COMMON TO ALL CLAIMS

**The String of Synagogue and Church Larcenies**

21. On June 26, 2017, at approximately 4:10 p.m., an unknown individual ("individual" or "suspect") was captured on video surveillance entering Westside Jewish Center located at 347 W. 34th Street in Manhattan.  The individual was observed removing a backpack containing religious items valued at approximately $3,800.

22. The same individual, on July 30, 2017, at approximately 12:35 p.m., entered the Westside Jewish Center and was captured on video surveillance stealing a bicycle.

23. On August 8, 2017, at approximately 6:30 p.m., the same individual entered St. John the Baptist Church, at 213 W. 20th Street in Manhattan and was captured on video surveillance removing United States currency from the gift shop counter.

5

24.  On August 18, 2017, at approximately 11:45 a.m., the same individual entered St.
Columba Church, 230 W. 20th street in Manhattan and was captured on video
surveillance removing property belonging to a member of the church.

**An Eyewitness Identifies the Suspect as Someone Other Than Campbell**

25. Complaining Witness 1 ("CW1") was the sole eyewitness to the August 18, 2017 larceny
at St. Columba Church.

26. She was interviewed on the date of the incident and gave a statement to officer Morales.

27. At approximately 11:50 a.m. that morning, CW1 was cleaning the third floor of St.
Columba Church when she observed an unknown individual inside of the priest's room.

28. The unknown individual walked towards her and then pushed her as he attempted to exit
the room and close the door behind him.  CW1 stuck her foot in the door preventing him
from closing it and followed him out of the church.

29. On August 19, 2017, Detective Ouellette, believing CW1 had a clear view of the suspect,
conducted a mugshot photo viewing with her.  The mug shot photographs were selected
by an NYPD computer database based on the description of the perpetrator.

30. CW1 identified a mugshot photo she believed was the person who robbed the church.

31. This person was not James Campbell.

**CW1 Does not Pick Out James Campbell's Photo in the Mug Shot Array**

32. James Campbell's photo, from a prior arrest, was randomly included in the mug shot
photos observed by CW1.

33. CW1, however, did not stop on, or identify Mr. Campbell's photo as the person she saw
in the church.

**The Incidents are Combined as Part of Pattern Robbery Report #6078**

34. On August 7, 2018, Detective Scollard opened Grand Larceny Pattern Report # 6078.

35. The Pattern Report included the incidents on June 26, 2017, and July 30, 2017.

36. These incidents were all believed to be committed by the same suspect.

37. On August 26, 2017, Detective Ouellette added the August 18, 2017 incident to Pattern Report # 6078.

**Under Pressure to Find the Suspect, the NYPD Issues Wanted Flyers and a Request for Media Attention**

38. After each incident an unknown individual fled the location prior to police arrival.

39. After each incident the police canvassed the scene for, and obtained, video footage.

40. The individual in each video is a middle-aged, heavyset, black male with a grey goatee. He was estimated to be between 5'9-6'0 feet tall and 180-195 pounds.

41. Detective Ouellette issued two Wanted flyers on August 18, 2017, with photo stills of the suspect taken from video surveillance footage.

42. On August 24, 2018, Detective Ouellette issued a request for media attention.

43. The requests included descriptions of two of the incidents, along with video footage.

**Plaintiff James Campbell does Not Match the Description of the Suspect**

44. At the time of the incidents James Campbell was a 50-year-old black male.

45. He was approximately 5 feet 8 inches tall and weighed 150 pounds.

46. He had black or brown close-cut hair.

47. He did not have a grey goatee.

**The NYPD Receives a Tip on a Suspect Who Matches the Description (Not James Campbell)**

48.   On August 29, 2017, the NYPD received a tip that an individual named Clyde Crenshaw matched the description of the footage released to the media.

49. Detective Vinculado completed a Domain Awareness System Inquiry on Mr. Crenshaw.

50. Detective Vinculado conducted a social media inquiry on Mr. Crenshaw and attached multiple facebook photos to his report.

51. The photos show a black male with a grey goatee.

**A Facial Identification Search was Requested and did Not Match James Campbell**

52. On August 30, 2017, Detective Ouellette Requested the NYPD's Real Time Crime Center conduct a Facial Identification Search.

53.  Ouellette attached video footage from the August 18, 2017 incident to be reviewed in Facial Identification Search.

54. The Facial Identification Search was "rejected", on September 5, 2018, because Detective Ouellette reported that he had identified the suspect.

**NYPD Issues an I-Card for Campbell Based on One Detective's Identification**

55. Detective Ouellette, on August 31, 2017, showed video footage of one of the incidents to Field Intelligence Officer (FIO) Cagirici.

56. Chagirici allegedly identified the suspect in the video as James Campbell.

57. Detective Ouellette, on August 31, 2017, issued an I-Card for Campbell's arrest.

58. The officers had no DNA, no fingerprints, no property recovered, and no physical evidence tying Campbell to any of the incidents.

**False Arrest of James Campbell for Unlicensed General Vending**

59. On September 7, 2017, at approximately 11:10 a.m., Officer Pinckney arrested James

Campbell, after recognizing him from the Wanted Posters, for allegedly offering sale of a

mini-speaker without a license.

60. The complaint, including the charge of unlicensed general vending, was deemed facially

insufficient and was dismissed in its entirety on December 21, 2017.

61. This false arrest was made with the intent and motive to question Campbell about the

pattern larcenies.

**Interrogation and Attempted Coercion of Campbell**

62. Approximately three hours after this arrest, Campbell was placed in an interrogation

room at the Tenth Precinct.

63. Campbell did not have a grey goatee.

64. He was questioned for an hour by NYPD officers including: Detective Ouellette,

Detective Estwick, Detective Scollard, and Sergeant Anders.

65. Campbell had a prior relationship with Detective Estwick and Sergeant Anders.

Campbell knew these officers and wanted to maintain a positive relationship with them.

66. The detectives repeatedly attempted to coerce him into confessing to the larcenies.

67. The officers knew they needed a confession from Campbell, because the suspect in the

photos had clear physical differences from Campbell, and they had no physical evidence

tying plaintiff to the crimes.

68. Plaintiff was shown three photos of the suspect standing on the street outside of where

the incidents occurred.

69. Each photo was blurry or taken from a distance.

9

70. In each photo the suspect was wearing a hat.

71. Campbell initially states that the person in two of the photos may look like him, and one does not.

72. Two minutes later he states that the photos do not look like him.

73. Campbell then asks to see a close up of the photos.  The Detectives refuse to provide a close up.

74. The detectives then accuse him of stealing from a church or synagogue.

75.  Campbell denies repeatedly and vehemently, for the next forty minutes, ever stealing anything from any church or synagogue.

76. He is then shown a cellphone video by Detective Scollard of one of the incidents.

77. He repeatedly states that the suspect in the video looks and walks different than him.

78. He is then asked about religious and other property taken during the incidents, and denies knowing about any religious robe or any other item ever taken.

79. He is then shown another video of one of the incidents on Detective Ouellette's cell phone, and again denies it is him.

80. He again asks for a close up of his face.

81. Detective Estwick repeatedly promises him there is a clear picture of his face, but never produces one.

82. Sergeant Anders then attempts to coerce him into confessing, and Campbell again denies the suspect is him.

83. Campbell consistently denies that he is the suspect in any of the videos.

84. Campbell states we can go all the way with this.

**Detective Scollard Fabricates Evidence**

85. At 11:25 p.m. on September 7, 2017, Detective Scollard signed a felony complaint in which he indicated that Campbell had identified himself as the person in video footage taking a complainant's backpack from a Synagogue.

86. Campbell had, earlier that afternoon, vehemently denied to Detective Scollard that he had stolen any property from a Church or Synagogue or was the person depicted in any still photographs shown to him.

87. Detective Scollard stated that he observed Campbell on video footage stealing property in three separate incidents.

88. Sergeant Castillo supervised this investigation, arrest, and the interrogation of Campbell.

**Campbell is Arraigned and Has Bail Set**

89. On September 8, 2017 Campbell was arraigned for charges related to at least three different larcenies.

90. He had bail set at $20,000.

91. Campbell was also arraigned on Unlicensed General Vending.  Bail was set at $1 on that charge.

**Campbell is Indicted After a Tainted Grand Jury Procedure**

92. Campbell was indicted by a grand jury on September 13, 2017.

93. CW1 was the only eyewitness who testified in the grand jury.

94. CW1 did not testify that Campbell was the suspect in the church.

95. CW1 did not testify that she had identified a different suspect in the mug shot photo array.

96. A detective testified in the grand jury that he identified Campbell as the suspect in the string of larcenies based on his observations of Campbell subsequent to his arrest, after comparing Campbell to the suspect in the video footage.

97. The detective did not testify that CW1 had identified a different suspect in the mug shot array.

98. The detective did not testify that CW1 did not pick out Campbell's photo in the mug shot array.

99. Complainant Witness 2 ("CW2"), an eyewitness from the July 30, 2017 incident had previously told officers that he/she could identify the larceny suspect.

100. CW2 did not testify at the grand jury.

101. No eyewitnesses were called to identify the suspect in the church.

**The District Attorney Observes Campbell for the First Time and He is Released**

102. On October 16, 2017, after watching the video surveillance footage and meeting with Plaintiff, Defense counsel notified the District Attorney that the suspect in the surveillance footage was not James Campbell.

103. The District Attorney asked for Campbell to be produced, so he could observe him in person for the first time, and agreed that Campbell was not the person depicted in the surveillance videos.

104. The District Attorney stated that there were "significant differences in [Campbell's and the suspect's] appearance, such as their builds and the color of the hair in their beards."

105. The District Attorney consented to Campbell's release on October 23, 2017.

**The Case is Dismissed**

106.    On April 30, 2018, at recommendation of the District Attorney, all charges against Campbell were dismissed.

## INJURIES AND DAMAGES

107.    This action seeks damages on behalf of Plaintiff for the loss of liberty, extraordinary emotional pain and suffering, and injuries to his person, that Plaintiff was forced to endure as a consequence of Defendants' decidedly wrongful actions.

108.    As a result of his wrongful arrest and unjust imprisonment, despite his actual innocence of the crime, Campbell was incarcerated for 46 days.  He has suffered, and continues to suffer, severe and ongoing damages, specifically including lost educational and professional, physical pain and injuries, inadequate medical care, serious psychological and emotional damage, loss of familial relationships, and loss of quality of life.

109.    The acts and omissions of Defendants entitle Campbell to compensatory and punitive damages.

## FIRST CLAIM:

### FABRICATION OF EVIDENCE
### (Against Individual Detectives and Officers)

110.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein and further alleges that Individual Detectives and Officers acting individually and in concert and conspiracy, deliberately and recklessly fabricated evidence.

111.    By their conduct, as described herein, and acting under color of state law, defendants are liable to plaintiff under 42 U.S.C. § 1983 for the violation of his

constitutional right to be free from fabrication of evidence pursuant to the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and under 42 U.S.C. § 1983.

112.    Detectives Ouellette and Estwick fabricated evidence by using Guilt Presumptive Questioning to coerce a confirmatory statement from Campbell. Campbell, believing he was under investigation only for unlicensed general vending, initially confirmed that he was depicted in a blurry photo taken from a distance, of a black male with a hat on.

113.    Campbell, after taking a closer look at the photos, and viewing video footage, repeatedly over the next hour denied he was the suspect in the photos or videos.

114.    Campbell had a prior relationship with these detectives and initially trusted them.

115.    The detectives continued this fabrication by passing on Campbell's alleged confirmatory identification to other detectives and the District Attorney, even after Campbell repeatedly denied that the person in the video footage looked like him, and asked to see an enlarged version of the photographs shown to him.

116.    Detective Scollard fabricated evidence by stating in a felony complaint that Campbell had identified himself as the person taking property from a backpack, and as the suspect in a still photo.

117.    Officer Pinckney fabricated evidence by stating that Campbell had offered to sell a mini-speaker.

118.    As a direct and proximate result, individual detectives' fabrication of evidence, violated Campbell's clearly established due process rights including the right to a fair trial, and caused him to be wrongfully convicted and to suffer the injuries and damages described above.

14

**SECOND CLAIM:**

**MALICIOUS PROSECUTION or
PROSECUTION WITHOUT PROBABLE CAUSE
(Against Individual Detectives and Officers)**

119.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in

the above paragraphs with the same force and effect as if fully set forth herein.

120.     By their conduct, as described herein, and acting under color of state law,

defendants are liable to plaintiff under 42 U.S.C. § 1983 for the violation of his

constitutional right to be free from malicious prosecution under the Fourth and

Fourteenth Amendments to the United States Constitution.

121.     Individual Detectives and Officers, despite knowing that probable cause did not

exist to arrest and prosecute Campbell, intentionally, recklessly, and with malice caused

Campbell to be arrested, prosecuted, and indicted.

122.     Detectives and Officers purposely attempted to elicit a false confession from

Campbell, against Plaintiff's strenuous objections.

123.     Defendants arrested Campbell even though they knew he was not the person

depicted in the video and had no physical evidence tying him to any of the incidents.

124.     Furthermore, Detectives and Officers intentionally withheld from and

misrepresented to prosecutors and the grand jury facts that further vitiated probable cause

against Campbell.

125.     Defendants did not disclose, prior to the grand jury indictment, that CW1 had

identified a mug shot other than Campbell's and that she had specifically not identified

Campbell's photo and could not identify him at the time of the grand jury.

126.     Campbell is innocent.  The prosecution finally terminated in his favor on April

30, 2018.

127.     As a direct and proximate result, Campbell was wrongly arrested and imprisoned,

causing him to suffer the injuries and damages described above.

### THIRD CLAIM:

### FAILURE TO INTERVENE
### (Against Individual Detectives)

128.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

129.     Those defendants that were present but did not actively participate in the

aforementioned unlawful conduct observed such conduct, had an opportunity prevent

such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

130.     Accordingly, the defendants who failed to intervene violated the Fourth, Fifth,

Sixth and Fourteenth Amendments.

131.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the

damages hereinbefore alleged.

### FOURTH CLAIM:

### MONELL LIABILITY
### (Against all defendants)

132.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

133.     This is not an isolated incident.

134.      NYPD detectives are trained in Guilt Presumptive interrogation techniques also

known as the Reid Technique.

135.     The primary trainers of police interrogation techniques have recently ceased

training of Guilt Presumptive Questioning, because of its propensity to induce false

confessions.  *A Major Player in Law Enforcement Says it Will Stop Using a Method That has Been Linked to False Confessions*, Business Insider, Mar. 9, 2017 (available at https://www.businessinsider.com/reid-technique-false-confessions-law-enforcement-2017-3?utm_source=copy-link&utm_medium=referral&utm_content=topbar&utm_term=desktop).

136.      Individual Detectives used Guilt Presumptive Questioning, also known as the "Reid" technique, to attempt to elicit a false confession from Campbell.

137.      Guilt Presumptive Questioning is a wide spread practice during NYPD interrogations.  *Four Years Later, False Confessions Still a Problem in New York*, Innocence Project, May 21, 2010 ("False confessions or admissions played a role in nearly half of the 26 wrongful convictions overturned by DNA evidence in New York. Confessions or admissions, even those which contradict key details of the crime itself, can often short-circuit a police investigation and allow the real perpetrator to go free.").

138.      The city is aware of this practice, its wide spread nature, and its propensity to cause false confessions.  *See People v. Bedessie*, 19 N.Y.3d 147, 159 (2012) ("Research also purports to identify certain conditions or characteristics of an interrogation which might induce someone to confess falsely to a crime . . ." such as a claim by a detective of "overwhelming evidence linking [a suspect] to a crime."); *see also* Business Insider ("'Confrontation is not an effective way of getting truthful information,' said Shane Sturman, the company's president and CEO. 'This was a big move for us, but it's a decision that's been coming for quite some time. More and more of our law enforcement clients have asked us to remove it from their training based on all the academic research showing other interrogation styles to be much less risky.' Research and a spate of

17

exonerations have shown for years that Reid interrogation tactics and similar methods can lead to false confessions. But the admission by such a prominent player in law enforcement was seismic."); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 459 (S.D.N.Y. 2012) (finding guilt presumptive questioning may lead to a coerced confession).

139.     The City of New York (the "City"), through policies, practices and customs, directly caused the constitutional violations suffered by plaintiff.

140.     The City, through its police department, has had and still has hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the constitution and is indifferent to the consequences.

141.     The City, at all relevant times, was, upon information and belief, aware that these individual defendants routinely commit constitutional violations such as those at issue here and has failed to change its policies, practices and customs to stop this behavior.

142.     The City, at all relevant times, was aware that these individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

143.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

### FIFTH CLAIM:

### MALICIOUS PROSECUTION UNDER
### NEW YORK STATE LAW
### (Against All Defendants)

18

144.     Campbell repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and he further alleges as follows.

145.     The Individual Detectives caused the commencement and continuance of criminal proceedings against Campbell.

146.     There was no probable cause for criminal proceedings against Campbell for the string of robberies and the Individual Detectives knew or should have known as much.

147.     The Individual Detectives acted with actual malice.  This is evidenced through their attempted coercion of a false confession by Campbell.

148.      The criminal proceedings against Campbell terminated in his favor when all charges against him were dismissed on April 30, 2018.

149.     Defendant the City of New York is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, the Individual Detectives.

**SIXTH CLAIM:**

**INTENTIONAL, RECKLESS, and/or NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER NEW YORK STATE LAW**
**(Against All Defendants)**

150.     Campbell repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein, and further alleges as follows.

151.     The conduct of the Individual Detectives in deliberately causing, and/or recklessly, and/or negligently disregarding the risk of wrongful arrest, prosecution, and incarceration of Jones by, among other things, (i) compelling him to be a witness against himself, (ii) fabricating evidence, (iii) withholding exculpatory material and impeachment evidence, (iv) threatening and coercing Campbell, (v) lying to prosecutors, the court, the defense, and

the jury, and (vi) causing Campbell to be maliciously prosecuted for crimes he did not commit was extreme and outrageous and directly and proximately caused the grievous injuries and damages set forth herein.

152.     The Individual Detectives actions were in violation of clearly established law, and no reasonable police officer in 2017 or thereafter would have believed the actions of the Individual Detectives to be reasonable or lawful.

153.     Defendant the City of New York is liable under the doctrine of *respondeat superior* for the unlawful conduct of its employees, the Individual Detectives.

## SEVENTH CLAIM:

## FALSE ARREST

154.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

155.     Officer Pinckney violated the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 because she arrested plaintiff without probable cause.

156.     As a direct and proximate result of this unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff respectfully requests judgment against defendants as follows:

(a)  Compensatory damages against all defendants, jointly and severally;

(b)  Punitive damages against the individual defendants, jointly and severally;

(c)  Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988; and

(d)  Such other and further relief as this Court deems just and proper.

Dated:          April 24, 2019
                New York, New York

                                        /s/ Abraham Rubert-Schewel
                                        Abraham Rubert-Schewel
                                        Lord & Schewel PLLC
                                        233 Broadway, Suite 2220
                                        New York, NY 10279
                                        W: 212-964-0280
                                        C:  919-451-9216
                                        E:  Schewel@nycivilrights.nyc


                                        /s/ Rob Rickner
                                        Rob Rickner
                                        Rickner PLLC
                                        233 Broadway Suite 2220
                                        New York, New York 10279
                                        Phone: (212) 965-9370
                                        Fax: (888) 390-5401